

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40469-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEN JOSEPH ROSE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, C.J. — Allen Joseph Rose appeals his conviction of unlawful imprisonment raising two issues. First, he contends the evidence was insufficient to prove that he substantially interfered with the victim's liberty or knowingly restrained her without consent. Second, he argues the prosecutor committed incurable flagrant and ill-intentioned misconduct at trial by discussing facts not in evidence.

We disagree and affirm.

BACKGROUND

In addressing a challenge to the sufficiency of evidence, we consider the evidence in a light most favorable to the State. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The following facts are taken from evidence admitted at trial.

Allen Rose and A.C. were in a romantic relationship for 11 years and have two children together. Throughout that time, they occasionally lived together. A.C. also has three children from a different relationship.

By November 2023, Rose and A.C.'s relationship was deteriorating. A.C. was living in her own apartment and Rose was staying there irregularly. Rose described his own behavior during this time as running the streets and struggling with drug addiction. A.C. was also seeing other people.

On November 3, 2023, Rose and A.C. got into a heated argument over A.C.'s decision to invite a male friend over to her apartment and Rose's refusal to leave. Rose had been drinking throughout the day and was intoxicated. As the argument progressed, A.C. walked into her bedroom. Rose followed A.C. into the bedroom, shut the bedroom door, and locked it.

The exact sequence of the events that followed is unclear and disputed. At trial, A.C. testified that every time she tried to leave the bedroom, Rose would block her access to the door and would not let her leave. On cross-examination, A.C. said she did not remember if she actually asked Rose to move out of the way so she could leave the room. However, on redirect, A.C. testified that she told Rose she wanted to leave, and he said no.

At some point during the argument, A.C. sat on the edge of the bed and Rose stood close enough in front of her that she could not stand up. She clarified that "if I were to get up I would knock into him." Rep. of Proc. (RP) at 68.

A.C. indicated that as they continued arguing her phone rang and Rose took her phone out of her hand and tried to answer it. He then began going through her phone, despite A.C.'s protest to return it. In a raised voice, Rose began calling A.C. degrading names while he scrolled through A.C.'s phone. At some point, A.C. grabbed her phone back. Rose responded by punching A.C. in the face. Following the strike, A.C. fell backwards onto the bed where Rose proceeded to straddle her and put his hands around her neck, applying enough pressure to interfere with A.C.'s breathing for three seconds.

The State admitted body camera video showing the responding officer's initial interview with A.C. at the scene of the incident.[1] In the video, A.C. tells the officer, "I tried to go out of my room and he wouldn't let me. He wouldn't give me my phone so I could call anybody." RP at 149. In response to the officer's question about how Rose kept her from exiting the room, A.C. said, "He stood in the doorway—and wouldn't let me go through." RP at 149.

---

[1] Defense counsel objected to the video's admission to evidence arguing it was cumulative and more prejudicial than probative because it was identical to A.C.'s testimony. The court overruled the objection and admitted a portion of the video which included A.C.'s statements to the responding officer.

Rose's version of events differed from A.C.'s. At trial, Rose testified that he followed A.C. into the bedroom so the children would not hear them argue. When asked if it was habit to move an argument into the bedroom, Rose said it was for him. He indicated that A.C. tends to walk away when they argue and this upsets him.

In describing the assault, Rose said that A.C. was sitting on the bed and he was standing in front of her. As they argued, A.C.'s phone rang and Rose took the phone away from A.C. to answer it. After the caller hung up, Rose began going through the phone looking for the caller's number. A.C. then grabbed the phone, smacking Rose's hand in the process. Rose admitted he instinctively slapped A.C. in the face but claimed it was not intentional. He testified that A.C. fell back on the bed and he leaned over her with his hands on either side of her head and continued yelling at her. At that point, A.C.'s oldest daughter popped the lock and entered the room. Rose testified he chased the daughter out of the bedroom, closed the door, and locked it.

Rose testified that he never intended to prevent A.C. from leaving the bedroom. Likewise, he did "not necessarily" prevent A.C. from leaving the room. He acknowledged that before he slapped A.C., he was pacing back and forth in the room. When asked if he prevented A.C. from going to the door, Rose testified that he did not know if A.C. was trying to leave and he did not intend to block her from leaving. He said A.C. did not ask to leave the bedroom. Instead, she asked Rose to leave the apartment, and he refused. He also testified that while sitting on the bed, A.C. stood up but then sat

4

back down.  Rose attributed this to balance issues related to A.C.'s multiple sclerosis (MS) diagnosis.  When A.C. was lying on the bed and Rose was on top of her, Rose said his intention was only to yell at her.

### *The State's Closing Argument*

In closing argument, the prosecutor instructed the jury to consider only the evidence, not either side's arguments.  She clarified the jury must consider testimony of witnesses.  Regarding the unlawful imprisonment charge, the prosecutor pointed to A.C.'s testimony that "she asked to leave multiple times, that the defendant was so close to her when she was sitting on the bed and . . . [h]e wouldn't let her leave.— standing in front of her and blocking the door.  Locking the door behind him when he came in."  RP at 259.  The prosecutor also emphasized Rose's testimony about pacing in front of the door, A.C.'s attempt to stand up, and Rose's refusal to leave the room.  Defense counsel did not object to any of this argument.  The court instructed the jury to consider the evidence in reaching their verdict and that "the lawyers' statements are not evidence." RP at 238.

The jury found Rose guilty of second and fourth degree assault and unlawful imprisonment.  The jury returned special verdict findings for the domestic violence enhancements for both of the assault charges as well as the unlawful imprisonment charge.

5

ANALYSIS

1. SUFFICIENCY OF THE EVIDENCE

Rose contends three elements of unlawful imprisonment lack sufficient evidence. We address each element in turn, after a review of the relevant standard of review and legal principles.

*A. Standard of Review and Legal Principles*

Due process mandates that the State must prove every element of a crime beyond a reasonable doubt to secure a conviction. *State v. Aver*, 109 Wn.2d 303, 310, 745 P.2d 479 (1987); U.S. CONST. amend. XIV § 1; Wash. Const. art. I, § 3. When reviewing a challenge to the sufficiency of the evidence, we ask "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *Salinas*, 119 Wn.2d at 201. "[A]ll reasonable inferences from the evidence must be drawn in favor of the State and interpreted most strongly against the defendant." *Id.*

"The sufficiency of the evidence is a question of constitutional law that we review de novo." *State v. Rich*, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). This court's review "is highly deferential to the jury's decision" and does not include weighing credibility, persuasiveness, or conflicting testimony. *State v. Davis*, 182 Wn.2d 222, 227, 340 P.3d 820 (2014). Additionally, "[a] claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *Salinas*, 119

Wn.2d at 201. "'Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of the evidence.'" *State v. Scanlan*, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting *State v. Kintz*, 169 Wn.2d 537, 551, 238 P.3d 470 (2010)). "If a reviewing court finds insufficient evidence to prove an element of a crime, reversal is required." *State v. Smith*, 155 Wn.2d 496, 505, 120 P.3d 559 (2005).

"A person commits the crime of unlawful imprisonment when he or she knowingly restrains the movements of another person in a manner that substantially interferes with the other person's liberty, if the restraint is without legal authority and without the other person's consent." Clerk's Papers (CP) at 52; *see also* RCW 9A.40.040(1), .010(6). Here, the jury was instructed that in order to find Rose guilty of unlawful imprisonment, the State must prove the following elements beyond a reasonable doubt:

1) That on or about November 3, 2023, the defendant knowingly restrained the movements of [A.C.] in a manner that substantially interfered with her liberty;

2) That such restraint was without [A.C.'s] consent;

3) That the defendant knew that such restraint was without [A.C.'s] consent;

4) That such restraint was without legal authority; and

5) That any of these acts occurred in the State of Washington.

CP at 54 (Jury Instruction No. 14).

On appeal, Rose challenges the sufficiency of the evidence to support three elements: (1) that he restrained A.C. in a manner that substantially interfered with A.C.'s liberty, (2) that he restrained her without her consent and (3) that he knew any restraint was without A.C.'s consent.

### B. Substantial Interference with Liberty

Unlawful imprisonment is the restraint of another person that substantially interferes with his or her liberty in a substantial way, as opposed to an imaginary way. *See State v. Robinson*, 20 Wn. App. 882, 884, 582 P.2d 580 (1978). "'Substantial' is used here as an adjective to mean a 'real' or 'material' interference with the liberty of another as contrasted with a petty annoyance, a slight inconvenience, or an imaginary conflict." *Id*. A substantial interference must be more than a slight inconvenience, but need not rise to the level of "restraining someone in a secret place or use or threat of deadly force." *Id*. at 884-85.

Rose contends that while there may have been an interference, it was insignificant and a mere inconvenience. However, his argument artificially narrows the evidence of interference to the period of time in which Rose was standing in front of A.C. while she was seated on the bed. He argues that even if this was interference, it was a petty annoyance, a minor inconvenience, or an imagined conflict.

In *Robinson*, the court hypothesized that a petty annoyance would be "stopping someone on the street in a mistaken belief as to the person's identity or facetiously

8

pushing an elevator button so as to take another occupant beyond the floor which he or she intended to go." *Id*. These examples illustrate flippancy and light-heartedness. *See also State v. Michal*, No. 34744-3-III, slip op. at 3 (Wash. Ct. App. Jan. 4, 2018) (unpublished), https://www.courts.wa.gov/opinions/pdf/347443_unp.pdf (noting "run of the mill restrictions of passage in everyday life, such as bumping into a coworker in the hall, does not constitute a crime").

After describing this distinction, the *Robinson* court had "no difficulty" finding the defendant's actions of stopping his car to ask a young girl if she wanted a ride and then, when she refused, driving around the block, jumping out of his car, chasing, grabbing, and attempting to pull her into his car as sufficient to support a conviction for unlawful imprisonment. 20 Wn. App. at 885; s*ee also State v. Dillon*, 12 Wn. App. 2d 133, 145-46, 456 P.3d 1199 (2020), *disapproved on other grounds by State v. Luna*, 5 Wn.3d 465, 578 P.3d 273 (2025) (finding sufficient evidence of substantial interference where defendant prevented a customer from exiting the store by threatening to cut and shoot him, physically blocking the exit, and jumping at him); *Scanlan*, 193 Wn.2d at 773 (concluding defendant's conduct was more than a mere inconvenience where an elderly victim was starved, isolated, beaten, and locked inside a room).

Although *Robinson*, 20 Wn. App. 882, *Dillon*, 12 Wn. App. 2d, and *Scanlan*, 193 Wn.2d 753, involve more extreme and violent facts, they do not support Rose's logic that less extreme conduct is necessarily insufficient. Here, the evidence of substantial

9

interference is more than just Rose standing in front of A.C. while she sat on the bed.

Considered in a light most favorable to the State, the evidence includes Rose walking into

the bedroom behind A.C., locking the door, blocking the door with his body "every time

[she] would try to go through the door," telling her no when she asked to leave the room,

standing so close in front of A.C. that she could not stand up from the bed especially in

light of her MS, taking her phone, yelling obscenities at her, punching A.C., and then

leaning over the top of her as she lay back and putting his hands on her throat and

continuing to yell at her. RP at 37, 68, 184, 202. These actions were more than "a petty

annoyance, a slight inconvenience, or an imaginary conflict." *See Robinson*, 20 Wn.

App. at 884. As such, the evidence is sufficient to support a finding that Rose restrained

A.C.'s movement in a manner that substantially interfered with her liberty.

### C. Restraint Without Consent

Rose contends the evidence was also insufficient to prove that he restrained A.C.

without her consent. Rose relies on the same cases referenced above to argue that a

substantial level of physical force and intimidation is needed to prove restraint. We

disagree.

Restraint is 'without consent' if it is accomplished by physical force, intimidation,

or deception. RCW 9A.40.010(6); *Scanlan*, 193 Wn.2d at 771. "'Intimidate' is defined

as: 'to make timid or fearful: inspire or affect with fear: frighten . . . to compel to action

or inaction (as by threats).'" *State v. Lansdowne*, 111 Wn. App. 882, 891, 46 P.3d 836

(2002) (alteration in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL

DICTIONARY 1184 (1993)). The term has also been described as suggesting "'a display

or application (as of force or learning) so as to cause fear *or* a sense of inferiority and a

consequent submission.'" *State v. Avila*, 102 Wn. App. 882, 889, 10 P.3d 486 (2000)

(quoting WEBSTER'S, supra, at 1184). Although direct threats of force or violence are

one way of intimidating another, the definition encompasses indirect threats and conduct.

The key inquiry is whether the defendant's actions caused the victim to feel fear or

compelled them to remain in place against their will.

Here, when viewed in a light most favorable to the State, the evidence is sufficient

to support the jury's finding that Rose used physical force and intimidation to prevent

A.C. from leaving the bedroom. A.C. asked Rose to leave her apartment and he refused.

Rose acknowledged that A.C. tended to walk away from Rose when they argued and this

upset him. When A.C. walked into the bedroom, Rose followed her and locked the door.

In the bedroom, Rose moved his body between A.C. and the door to prevent her from

leaving. When A.C. sat on the bed, Rose, who knew A.C. has MS, stood close enough to

block her from standing. While doing this, Rose grabbed A.C.'s phone from her and

started going through it, yelling at her, and calling her degrading names. When A.C.

grabbed her phone back, Rose struck her in the face. When A.C. fell back on the bed,

Rose straddled her and put his hands on her throat. Rose's words and conduct were

sufficient to show that he restrained A.C. through physical force and intimidation.

11

### D. *Knowingly Restrained Without Consent*

Finally, Rose contends there is insufficient evidence to prove that he knowingly restrained A.C. without her consent. In support of this argument, he posits that A.C. voluntarily walked into the bedroom to argue, the door was locked from the inside with a push-button lock, A.C. did not physically attempt to exit the room, and A.C. did not ask Rose to move away from the door.

Viewing the evidence in the light most favorable to the State, we conclude there was sufficient evidence for the jury to infer that Rose knew his restraint was without A.C.'s consent. Specifically, A.C. testified that she asked to leave the room and Rose told her no. While there is discrepancy between Rose's and A.C.'s testimonies, this court will not disrupt the jury's determination of credibility in reviewing sufficiency of the evidence. *See Davis*, 182 Wn.2d at 227 (holding that reviewing court will not consider credibility, persuasiveness, or conflicting testimony). Additionally, the jury could reasonably infer that Rose knew what he was doing when he refused to leave and instead stood between A.C. and the door and then stood so close to A.C. that she could not stand up from the bed.

The State presented sufficient evidence to prove beyond a reasonable doubt that Rose unlawfully imprisoned A.C.

2.   PROSECUTORIAL MISCONDUCT

Although trial counsel did not object, Rose argues the prosecutor committed reversible misconduct in closing argument by urging the jury to consider facts not in evidence.  In response, the State concedes that the prosecutor indicated that A.C. had testified multiple times that she asked to leave the bedroom, rather than once.  However, the State contends that this representation of A.C.'s testimony could have been obviated with a curative instruction and did not have a substantial likelihood of affecting the jury's verdict.  We agree with the State.

"'Allegations of prosecutorial misconduct are reviewed under an abuse of discretion standard.'"  *State v. Lindsay*, 180 Wn.2d 423, 430, 326 P.3d 125 (2014) (quoting *State v. Brett*, 126 Wn.2d 136, 174-75, 892 P.2d 29 (1995)).  "To prevail on a claim of prosecutorial misconduct, the defendant must establish 'that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'"  *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011) (internal quotation marks omitted) (quoting *State v. Magers*, 164 Wn.2d 174, 191, 189 P.3d 126 (2008)).  "Any allegedly improper statements should be viewed within the context of the prosecutor's entire argument, the issues in the case, the evidence discussed in the argument, and the jury instructions."  *State v. Dhaliwal*, 150 Wn.2d 559, 578, 79 P.3d 432 (2003).  "Prejudice on the part of the prosecutor is established only where 'there is a substantial likelihood the instances of misconduct affected the jury's verdict.'"

*Dhaliwal*, 150 Wn.2d at 578 (internal quotation marks omitted) (quoting *State v. Pirtle*, 127 Wn.2d 628, 672, 904 P.2d 245 (1995)).

If a defendant fails to object or request a curative instruction at trial, the issue of misconduct is considered waived unless it "was so flagrant and ill-intentioned that an instruction could not have cured the resulting prejudice." *Lindsay*, 180 Wn.2d at 430. Our supreme court has "found prosecutorial misconduct to be flagrant and ill intentioned in a narrow set of cases where [it was] concerned about the jury drawing improper inferences from the evidence, such as those comments alluding to race or a defendant's membership in a particular group, or where the prosecutor otherwise comments on the evidence in an inflammatory manner." *In re Pers. Restraint of Phelps*, 190 Wn.2d 155, 170, 410 P.3d 1142 (2018). "If the prejudice could have been cured by a jury instruction, but the defense did not request one, reversal is not required." *Dhaliwal*, 150 Wn.2d at 578.

We accept the State's concession that the prosecutor misspoke by stating A.C. requested to leave the room on more than one occasion. Thus, we must consider whether the error was so flagrant and ill intentioned as to result in unfair prejudice to Rose. Where the defendant did not object to an improper statement at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). Based on this heightened

14

standard, Rose must show "that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Id.* at 761 (quoting *Thorgerson*, 172 Wn.2d at 455.

Here, the trial court instructed the jury that counsels' arguments were not evidence, and the jury should disregard such remarks if the evidence did not support them. This routine instruction was sufficient to minimize any prejudice against Rose because jurors are presumed to follow the court's instructions. *See Emery*, 174 Wn.2d at 766. Despite the prosecutor's blunder in word choice during closing argument, the misconduct was not substantial enough to result in an unfair trial to Rose because the court gave a clarifying instruction.

Nevertheless, even without an instruction to the jury, the prosecutor's misconduct did not result in prejudice that had a substantial likelihood of affecting the jury verdict. Regardless of how many times A.C. verbally indicated her desire to leave the bedroom and Rose's denial of such requests, the jury could still make a finding that Rose knowingly restrained A.C. The jury could have relied solely on Rose's conduct in physically blocking the bedroom door to find that Rose knowingly restrained A.C. A.C.'s quantity of requests is not the determining factor in this case, so the mischaracterization of A.C.'s testimony is unlikely to have affected the jury verdict.

Any prejudice caused by the prosecutor's mischaracterization of the victim's testimony was cured when the trial court gave an instruction to the jury that the lawyers' statements are not evidence. Furthermore, even without the court's instruction, the prosecutor's statement did not create prejudice that would have a substantial likelihood of affecting the jury's verdict.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Cooney, J.

16